UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 22 2019

JACQUELINE VERGANZO
ALMODOVAR,

              Plaintiff,

  -against-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

             Defendant.

17-CV-8902 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Jacqueline Verganzo Almodovar brings this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI). The parties have consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 15) and have cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 20, 22.)

As discussed in more detail below, the Administrative Law Judge (ALJ) erred, when assessing the opinion evidence concerning plaintiff's mental impairments, by ignoring the opinion of one of plaintiff's treating psychiatrists, and by rejecting some of the conclusions of the consultative psychologist who personally examined the plaintiff in deference to the less favorable conclusions drawn by a non-examining review psychologist who based his analysis solely on the consultative examiner's report. Therefore, plaintiff's motion will be granted, the Commissioner's motion will be denied, and the case will be remanded.

# I.   BACKGROUND

## A.   Procedural Background

Plaintiff applied for SSI on May 5, 2014, alleging disability since December 1, 2012 due to epilepsy, high blood pressure, anxiety, depression, and lower back pain. *See* Certified Administrative Record (Dkt. No. 16) (hereinafter "R. __") at 173. The Social Security Administration (SSA) denied her claim on July 30, 2014. (R. 108.)

Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) and, on April 29, 2016, she appeared with counsel before ALJ Paul R. Armstrong. (R. 40-94.) On June 29, 2016 the ALJ issued a written decision (Decision) finding that plaintiff was not disabled within the meaning of the Act. (R. 18-31.) Plaintiff timely requested review by the Appeals Council, but her request was rejected on September 18, 2017, making the ALJ's Decision final. (R. 1-6.)

## B.   Personal Background

Plaintiff was born on October 4, 1973. (R. 195.) She never graduated from high school or obtained a GED. (R. 56.) From 2000 through 2001, she worked as a sales clerk, but ceased working after her employer went bankrupt. (R. 48-49, 184, 230.) Thereafter, she worked intermittently as a babysitter for her nephews and nieces until she suffered a seizure while babysitting in or around 2008, which caused the children's parents to stop using plaintiff's services. (R. 49-50, 187.)

In a Disability Report prepared in connection with her application for SSI, plaintiff alleged disability due to epilepsy, high blood pressure, anxiety, depression, and lower back pain. (R. 200.) In her associated Function Report, plaintiff stated that she took care of her adult sons, including cooking for them and washing their clothes, and that she could cook, clean, groom herself, do laundry, shop, and take public transportation alone. (R. 216.) Plaintiff also reported chronic pain (R. 223-24) and stated that she had difficulty sitting, standing or walking "too much" or for "too

long." (R. 220-21.) She further reported that she had difficulty reaching, climbing stairs, and lifting, due to numbness, cramps, and "tiredness." (R. 220-225.)

## II.     PLAINTIFF'S MEDICAL HISTORY

In accordance with this Court's order dated December 19, 2017 (Dkt. No. 13), plaintiff's opening brief summarized the relevant facts in the record. *See* Pl. Mem. (Dkt. No. 21), at 2-7. The Commissioner responded by noting her objections to some of plaintiff's descriptions and characterizations of the medical evidence, and by supplementing plaintiff's recitation with additional facts drawn from the record. *See* Def. Mem. (Dkt. No. 23), at 3-13. The Commissioner's objections are well founded. Accordingly, the Court adopts plaintiff's recitation of the facts as modified by the Commissioner's objections and supplementation. The Court discusses the medical evidence relevant to the determination of plaintiff's claim in section V below.

## III.    HEARING

On April 29, 2016, plaintiff appeared with counsel before ALJ Armstrong, who presided by video teleconference. (R. 40.) Plaintiff testified that although she used to suffer from epileptic seizures, after an increase in the dosage of her medication she had not had a seizure in since 2011. (R. 50.) At the time of the hearing, plaintiff was living with the younger of her two sons. (*Id.*) She reported that she had a contentious relationship with her elder son, who had bipolar disorder. (*Id.*) After an altercation, plaintiff obtained an order of protection against her elder son. The ALJ questioned plaintiff extensively about the steps she took to obtain the order of protection. Plaintiff explained that she went to court only once, taking the bus, to speak with prosecutors. (R. 50-52, 83-84.) The restraining order was then sent to her by mail. (R. 84.)

Plaintiff testified that her back pain, radiating into her legs and feet, combined with her depression, would prevent her from working as a full-time cashier. (R. 55-57.) She rated her pain as a nine out of ten without medication, and as a six with medication. (R. 57.) To relieve her pain,

3

she testified that she wore a back brace, or lay down. (R. 60, 63.) She stated that she could stand for five to ten minutes, sit for five to ten minutes, walk 15 to 30 minutes, and lift up to five pounds without pain. (R. 60, 69.) Plaintiff testified that she took care of four pet parakeets, but "it is easy" because she only had to change the paper in their cages every four to five days. (R. 71-72.) As for her mental impairments, plaintiff testified that she "forget[s] things," had difficulties concentrating, and was sensitive to stress. (R. 69, 83-84.) She testified that her anxiety prevented her from going to the park with a friend. (R. 73.)

In terms of her activities of daily living, plaintiff testified that she spent most of her days "laying down" because her medication made her drowsy. (R. 58-59.) She said that her impairments prevented her from cleaning her home without significant pain. (R. 60.) She was capable of walking to a local grocery store to shop, but had the groceries themselves delivered. (*Id.*)

At the conclusion of plaintiff's testimony, the ALJ posed a series of hypothetical questions to vocational expert (VE) Abbe May. The ALJ first asked whether a hypothetical claimant limited to light work[1] could perform plaintiff's past relevant work as a retail clerk or babysitter, to which the VE responded that she could. (R. 91-92.) The ALJ then asked the VE whether a hypothetical claimant limited to light work – and further limited to simple and unskilled work at SVP 1 or SVP 2 – could still perform those jobs. (R. 92.)[2] VE May testified that such a limitation would preclude

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[2] SVP stands for "specific vocational preparation" and refers to the amount of time it takes an individual to learn to do a given job. (R. 24 n.2.) *See also* 20 C.F.R. § 416.968(a). SVP 1 means that only a short demonstration is required to learn the job. SVP 2 means that it may take up to 30 days to learn the job. (*Id.*)

working as a retail clerk or babysitter – both of which are classified as "semi-skilled work with SVP 3." (R. 91-92.) However, such an individual could still work as an office helper, ticket seller, or cashier at SVP 2. (R. 92.) In response to further questioning from the ALJ, the VE added that these positions would still be available to a claimant who could not work at unprotected heights or around dangerous moving machinery, open flames, or bodies of water. (R. 92-93.) If such a claimant were further limited to sedentary jobs,[3] she could work as a document preparer, and if further limited to a position that did not require reading, as a final assembler. (R. 93.) However, if the same hypothetical claimant had to lie down for at least an hour during a workday, at irregular intervals, or had difficulties concentrating, and so would be off-task for an average of 15 minutes every hour, or would miss more than two days each month due to her impairments, she would be precluded from working. (R. 92-93.)

## IV.    THE ALJ DECISION

### A.    Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. § 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence,

_____

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1
. . . Assuming the claimant does not have a listed impairment, the fourth inquiry is
whether, despite the claimant's severe impairment, she has the residual functional
capacity to perform her past work. Finally, if the claimant is unable to perform her
past work, the burden then shifts to the Commissioner to determine whether there
is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process,

the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4). A claimant bears the

burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step.

*See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

1998). To support a finding that the claimant is not disabled at step five, the Commissioner must

offer evidence demonstrating that other work exists in significant numbers in the national and local

economies that the claimant can perform, given the claimant's residual functional capacity (RFC),

age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c).

The regulations provide further guidance for evaluating whether a mental impairment is a

"severe impairment." The ALJ must apply the prescribed "Psychiatric Review Technique" at the

second and third step of the five-step evaluation. *Petrie v. Astrue,* 412 F. App'x 401, 408 (2011)

(citing *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir. 2008)). This technique requires the ALJ "to

determine first whether the claimant has a 'medically determinable mental impairment.'" *Kohler,*

546 F.3d at 265-266, (quoting 20 C.F.R. § 404.1520a (b)(1) (2011)).[4] If she does, the ALJ must

_____

[4] 20 C.F.R. § 404.1520a (b)(1) applies to applicants for disability insurance benefits, but the same
Psychiatric Review Technique applies to applicants for SSI. *See* 20 C.F.R. § 416.920a(b)(1)
(2011). This regulation was amended in 2017, after the ALJ's Decision. Throughout this Opinion
and Order, the Court cites and applies the regulations as they existed at the time of the Decision.
Citations to regulations that have since been amended include the date of the version that was in
effect on June 29, 2016.

"rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R. § 416.920a(b)(2) (2011). The four main areas to be assessed are the claimant's (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3) (2011). The first three categories are rated on a five-point scale, from "none" through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4) (2011). The last area – episodes of decompensation – is rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4) (2011).[5]

If a mental disorder does not meet or equal a listed impairment, it may still qualify as a disability if the claimant's residual functional capacity (RFC) does not allow her to perform the requirements of her past relevant work and if there is no other work that she could perform in the national economy in light of her RFC, age, education, and work experience. 20 C.F.R. §§ 416.920(e), 416.960(c)(2). "The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including her credible testimony, the objective medical

---

[5] With respect to certain listed mental disorders, the claimant is also required to show at step three that she has at least two of the so-called "paragraph B criteria" or (for affective and anxiety disorders) "paragraph C criteria." The paragraph B criteria require *at least two* of the following: marked restriction of activities of daily living (ADLs); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 12.04(B) (affective disorders), 12.06(B) (anxiety related disorders), 12.08(B) (personality disorders) (2016). The paragraph C criteria for affective disorders require a medically documented history of an affective disorder that has caused a more than minimal limitation of the claimant's ability to do basic work activities, *and* at least *one of* the following: repeated episodes of decompensation, each extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See* 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C) (2016). The paragraph C criteria for anxiety disorders require a complete inability to function independently outside the home as a result of the disorder. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.06(C) (2016).

evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 416.920(e), 416.945(a)(3). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

### B.     Application of Standards

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since February 18, 2014, the application date. (R. 20.)

At step two, the ALJ found that plaintiff suffered from severe impairments including "degenerative disc disease (DDD), seizure disorder; and obesity." (R. 21.)

The ALJ noted that plaintiff alleged various mental limitations as a result of depression and anxiety, and consequently applied the Psychiatric Review Technique to determine whether those impairments were severe. (R. 21.) After reviewing plaintiff's psychological complaints, symptoms, and treatment (R. 20), the ALJ concluded that plaintiff suffered from at least one medically determinable mental impairment: affective and/or anxiety disorder. (R. 21.) The ALJ then reviewed the extent to which plaintiff's mental disorder impacted her ADLs, her social functioning, her concentration, persistence and pace, and her episodes of decompensation. (R. 22.) He found that she was not limited at all in her ADLs; had mild limitations in social functioning and in concentration, persistence and pace; and experienced no episodes of decompensation. (R. 21-22.) He therefore concluded that plaintiff did not suffer from a "severe" mental impairment. (R. 22.)

At step three, the ALJ found that none of plaintiff's severe impairments met or medically equaled any listed impairment. (R. 23.) The ALJ considered Listings 1.04 (disorders of the spine),

11.02 (epilepsy), 11.03 (epilepsy—non-convulsive epilepsy), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). (R. 22.)

The ALJ then assessed plaintiff's RFC, and found that she could:

> perform light work as defined in 20 CFR 416.967(b) except that she can perform simple, unskilled (SVP 1 or 2) work. The claimant is incapable of performing work at or around unprotected heights, dangerous moving machinery, open flames or bodies of water.

(R. 24.)

In formulating plaintiff's physical RFC, the ALJ discounted the opinion of physical medicine and rehabilitation specialist Ali Guy, M.D., who was one of plaintiff's treating physicians. (R. 28.) In a post-hearing Physical Assessment submitted on June 17, 2016, Dr. Guy opined that plaintiff could walk for two blocks without resting, could sit for 2-3 hours in an eight-hour day, could stand for 2-3 hours in the same day, could never lift or carry more than 10 pounds, would need to take frequent unscheduled breaks during the workday, and would be absent more than four days per month. (R. 619-21.) The ALJ gave Dr. Guy's opinion "little weight" because it was "not supported by the substantial evidence of record," and because Dr. Guy's views regarding postural limitations (on sitting and standing), unscheduled breaks, and absenteeism were "speculative." (R. 28.)

The ALJ gave "significant" weight to the June 17, 2014 opinion of internist Dipti Joshi, M.D., who performed a consultative examination of plaintiff, yielding mostly normal results,[6] and

_____

[6] Dr. Joshi observed that plaintiff had a normal gait, could walk on her heels and toes without difficulty, could "squat to about 50%," and needed no assistance changing, getting on and off the exam table, or rising from a chair. (R. 389.) Plaintiff told Dr. Joshi that she "cooks every other day, cleans once a week, does laundry once a week, shops once a month," and showers, dresses, and watches TV daily. (*Id.*) A musculoskeletal examination revealed full ranges of motion in the

recommended that she avoid working from heights, operating heavy machinery, or driving (all presumably due to plaintiff's history of seizures). (R. 28, 391.)[7] Dr. Joshi did not identify any further physical limitations other than "moderate limitations with squatting." (R. 391.)

With respect to plaintiff's mental RFC, the ALJ rejected the opinion of psychiatrist Luis Gonzales, M.D., who submitted a Mental Capacity Assessment dated February 5, 2015, in which he checked boxes to indicate that plaintiff had "marked" limitations in every functional category on the form, and would likely be absent four or more times per month. (R.612-15.)[8] The ALJ concluded that Dr. Gonzales's opinion was "not supported by the mental status examinations of record" (R. 28), including the exam performed by consultative psychologist Fredelyn Engelberg Damari, Ph.D. on June 17, 2014. (R. 382-86.)

Dr. Damari found that plaintiff's demeanor was cooperative, her manner of relating was adequate; her speech was fluent; her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia; her affect was dysphoric and her mood dysthymic; she was oriented x3; her insight was fair; and her judgment was good; however, her attention, concentration, and memory skills were "impaired possibly due to emotional distress"

---

cervical and lumbar spine, as well as the shoulders, elbows, forearms, hips, knees, and ankles, with no tenderness, redness, heat, swelling or effusion. (R. 390.)

[7] Plaintiff apparently told Dr. Joshi that her last seizure was "recent" and she had "six to seven" seizure episodes in the past year. (R. 388.) This is inconsistent with other evidence in the record, including plaintiff's hearing testimony that her last seizure was in 2011 (R. 50), which was three years prior to her appointment with Dr. Joshi.

[8] The form asked Dr. Gonzales to rate plaintiff's "mental/emotional capabilities" in 22 separate categories in four broad areas ("understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation"). Dr. Gonzales checked the "marked" box on each and every line. Asked to describe the findings supporting the assessment, he wrote, "severe depression, sadness, poor energy level, anhedonia, hopeless, helpless, poor concentration." (R. 613.)

and her cognitive functioning was "below average." (R. 383-85.)  Dr. Damari diagnosed plaintiff with generalized anxiety disorder and opined that she could follow and understand simple directions and perform simple tasks, maintain a regular schedule, learn new tasks, make appropriate decisions, and relate adequately to others, but was "mildly impaired in the ability to maintain attention and concentration," and "significantly impaired in the ability to perform complex tasks independently" and "to appropriately deal with stress." (R. 385.) Dr. Damari concluded that plaintiff's psychiatric problems were not "significant enough to interfere with [her] ability to function on a daily basis." (*Id*.) The ALJ gave "some" weight to Dr. Damari's opinion, except for the portion dealing with "complex tasks and dealing with stress," which he characterized as "not . . . supported in the record" and "largely speculative given [her] one-time observations of the claimant." (R. 27.)

The ALJ accorded "significant weight" (R. 28) to the opinion of state agency psychologist E. Kamin, Ph.D., who reviewed Dr. Damari's report and opined on June 25, 2014, that plaintiff had no restriction in daily activities, a mild limitation in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation. (R. 99.) Dr. Kamin noted that plaintiff had no history of psychiatric hospitalizations and concluded that she was "capable of performing simple work on a sustained basis." (R. 104.)  The ALJ explained that Dr. Kamin's opinion was "consistent [with] the weight of the evidence, the claimant's described daily activities, and the claimant's presentation at the hearing." (R. 28.)

The ALJ did not mention the opinion of psychiatrist Manuel Lopez-Leon, M.D., who saw plaintiff at the Jewish Board Mental Health Clinic (Jewish Board) in 2015 and 2016 for medication management.  Dr. Lopez-Leon diagnosed plaintiff with major depressive disorder and agoraphobia with panic disorder (R. 551, R. 556, R. 598),  and provided a functional assessment, dated February

11

29, 2016, finding that she had mild limitations in home management and moderate limitations in her interpersonal/social abilities, her educational/vocational abilities, her personal/health management abilities, and "leisure (hobbies, interests, etc)." (R. 600.)

At step five, relying on the vocational expert's testimony, the ALJ found that plaintiff was capable of performing her past relevant work as a cashier and babysitter, and that this work "does not require the performance of work-related activities precluded by the plaintiff's RFC." (R. 29.)[9] In the alternative, the ALJ found that "there are other jobs that exist in significant numbers in the national economy that the claimant can also perform" (R. 30), including the jobs of ticket seller, office helper, and cashier (*id*.), and that even if limited to sedentary work, plaintiff could perform the jobs of document preparer or final assembler. (R. 31.) Therefore, the ALJ concluded, plaintiff was not disabled under the Act. (*Id*.)

## V.     ANALYSIS

### A.     Standards

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside

---

[9] In fact, the VE testified that a claimant limited to simple, unskilled (SVP 1 or 2) light work, who is incapable of performing work at or around unprotected heights, dangerous moving machinery, open flames or bodies of water, could *not* perform plaintiff's past work as a retail clerk and a babysitter, because both of those jobs are classified as semi-skilled work at SVP 3. (R. 91-92.)

a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

### 1.    Substantial Evidence

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009) (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even

more so than the 'clearly erroneous' standard." *Id.*; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

### 2. Roadmap

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). If the ALJ fails to provide an adequate "roadmap" for his reasoning, remand may be appropriate. Where the ALJ adequately explains his reasoning, however, and where his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("[T]he court should not substitute its judgment for that of the Commissioner."); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.").

### 3. Treating Physician Rule

In evaluating the medical opinion evidence in the record, an ALJ is required to give controlling weight to the opinion of the claimant's treating physician, so long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2) (2012). A treating physician is the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [her], with medical treatment or evaluation and who has, or has had, an ongoing treatment

relationship with [her]." 20 C.F.R. § 416.902 (2011). The rule acknowledges that a claimant's treating physician can provide a "detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2) (2012). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the "longitudinal picture" takes on added significance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009). "A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015).

Although the treating physician rule is robust, it is not unassailable. The ALJ may discount a treating physician's opinion if it "lack[s] support or [is] internally inconsistent." *Duncan v. Astrue*, 2011 WL 1748549, at *20 (E.D.N.Y. May 6, 2011); *accord Lacava v. Astrue*, 2012 WL 6621731, at *12 (S.D.N.Y. Nov. 27, 2012). Similarly, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it

will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). *Accord* 20 C.F.R. § 916.927(c)(4) (2012).

The ALJ must, however, explain *why* he is discounting the opinion of a treating physician. In accordance with the "roadmap" rule discussed above, the ALJ must give "good reasons" for affording the opinion of a treating source less than controlling weight, and must set forth those reasons "comprehensively." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008)); 20 C.F.R. § 416.927(c)(2) (2012) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). Moreover, even if the treating physician opinion is not given controlling weight, the regulations require the ALJ to "explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist," *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129), in determining how much or little weight to assign to it. *See also* 20 C.F.R. § 416.927(c)(1) (2012) ("[W]e apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.").

The "requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable." *Snell*, 177 F.3d at 134. *See also Gallo v. Colvin*, 2016 WL 7744444, at *14 (S.D.N.Y. Dec. 23, 2016) ("Particularly where an ALJ does not credit a treating physician's findings, the claimant is entitled to an explanation.") (subsequent history omitted). It also functions to facilitate the Court's review of the agency decision. *Halloran*, 362 F.3d at 33 (The "good

reasons" requirement assists court's review of ALJ's decisions); *Rivera v. Astrue*, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) ("[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered.") (citation omitted). A "failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 802 F.3d at 375; *Halloran*, 362 F.3d at 33.

**B.      The Parties' Contentions**

Plaintiff does not challenge the ALJ's analysis at steps one, two, or three.  Rather, she contends that the ALJ failed to properly weigh the medical opinion testimony of record in formulating her RFC. With regard to her physical impairments, plaintiff argues that the ALJ erred by assigning "little weight" to the opinion of her treating physician Dr. Guy, and gave only "boilerplate" reasoning for doing so. Pl. Mem. at 12-13, 14-17; Pl. Reply Mem. at 2-3. With regard to her mental impairments, plaintiff argues that the ALJ erred by assigning only "some weight" to the opinion of treating psychiatrist Dr. Gonzales, without supplying good reasons for doing so. *See* Pl. Mem. at 10, 12; Pl. Reply Mem. (Dkt. No. 24) at 1-2. She also contends that the ALJ erred by failing to give more weight to the opinion of consultative examiner Dr. Damari regarding plaintiff's ability to handle stress. Pl. Mem. at 13-14; Pl. Reply Mem. at 2. Further, according to plaintiff, the ALJ erred by placing significant weight on the opinion of the non-examining state agency reviewer Dr. Kamin, which was rendered almost two years prior to the hearing, when Dr. Kamin "lack[ed] evidence of most impairments beyond Dr. Damari's examination." Pl. Mem. at 14.  Because of these errors, plaintiff argues, the ALJ's RFC determination was not supported by substantial evidence.  Pl. Mem. at 9.

The Commissioner contends that there was substantial evidence supporting the ALJ's RFC and that her determination cannot be overcome simply because plaintiff disagrees with "the ALJ's

weighing of the evidence."  Def. Mem. at 15. The Commissioner points out that the treating physician rule "is not absolute," *id*. at 17 (quoting *Cohen v. Comm'r of Soc. Sec.*,  643 F. App'x 51, 53, (2d Cir. 2016), and argues that the ALJ was entitled to reject Dr. Guy's opinion, even though there were some "positive objective findings" in the record, because it was rendered after only "a few visits," and because "there is a wide gulf between having a medical condition and being precluded from any substantial gainful activity." *Id*. at 21-22. The Commissioner further suggests that any error was harmless because "even had the ALJ found that Plaintiff was further limited to sedentary work, the outcome that Plaintiff was not totally disabled would be the same." *Id*. at 21. Similarly, as to plaintiff's mental impairments, the Commissioner contends that the ALJ was entitled to reject the opinion of Dr. Gonzales, because it was not supported by any "objective findings," and was further entitled to credit the opinion of non-examining expert Dr. Kamin over that of examining psychologist Dr. Damari, which "Dr. Kamin considered and viewed differently from the lay interpretation plaintiff crafts in this appeal." *Id*. at 20-21.

### C.    Application of Standards

The Court agrees with the Commissioner that the ALJ adequately explained why he gave little weight to the opinions of Dr. Guy and Dr. Gonzales. However, with regard to plaintiff's mental impairments, the ALJ erred in ignoring the opinion of Dr. Lopez-Leon.  He also erred in crediting the opinion of non-examining state agency reviewer Dr. Kamin – which was based on the report of examining psychologist Dr. Damari – over the opinion of Dr. Damari herself.

### 1.    Dr. Guy

The ALJ gave little weight to Dr. Guy's opinion because it was "not supported by the substantial evidence of record." (R. 28.)  The ALJ believed that Dr. Guy's proposed postural limitations (limiting plaintiff to sitting or standing no more than 2-3 hours at a time), as well as his view that plaintiff would require frequent unscheduled breaks during the work day and would be

absent more than four times per month, were "unsupported by any findings." (*Id.*) This was not error.

The record shows that plaintiff visited Dr. Guy's office on five occasions from February through June 2015. (R. 520-33.) Dr. Guy twice treated the plaintiff personally; at three other visits, it appears that a different physician, Aziz Namjouyan, M.D., performed the exam and discussed treatment options with plaintiff.[10] At each of these visits, plaintiff's physical exam revealed moderate lumbar tenderness and spasm, and at some (but not all) visits she also presented with a limited range of motion; however, her gait and stance were consistently normal, as were her reflexes; her straight leg raising tests were uniformly negative[11]; and neither Dr. Guy nor Dr. Namjouyan observed any loss of strength or (with one exception) sensation. (R. 523, 525, 529, 532.) Plaintiff was taking a non-narcotic analgesic for her back pain, with no reported side effects. (R. 532.)[12] At some visits she reported that the medicine provided only "minimal" relief (R. 528, 531), but on June 26, 2016, Dr. Namjouyan noted that it gave "marked" relief. (R. 522.)

A March 30, 2015 MRI revealed disc bulges at L4-5 and L5-S1, with right and left foraminal stenosis, and nerve root impingement at L5, but no central canal stenosis. (R. 527.) An EMG study on May 21, 2015, revealed "mild to moderate bilateral L4-L5 lumbar radiculopathy,"

---

[10] Dr. Guy's name appears on the notes of these visits only as the "Physician Supervisor." (R. 524, 529, 533.)

[11] In the Decision, the ALJ wrote that plaintiff had a "positive straight leg raising test on the right" in April 2015. (R. 26.) In fact, Dr. Namjouyan's April 15, 2015 treating notes reported a "negative left *and* right straight leg raising test" (R. 529) (emphasis added), providing even less support for Dr. Guy's opinion than the ALJ described.

[12] Plaintiff was prescribed Mobic, which is a brand name for Meloxicam, a nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis. *See* Mayo Clinic, "Meloxicam," www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited March 20, 2019).

for which Dr. Guy recommended physical therapy and/or epidural injections. (R. 525-26.) He noted that plaintiff had already had one injection, from which she received "good relief of pain," but only "for about two weeks." (R. 525.)[13] At every visit plaintiff was encouraged to exercise. (R. 523, 529, 532.)

These treating notes – including the repeated advice to exercise – provide little support for Dr. Guy's opinion as to plaintiff's physical capabilities. Moreover, there is a gap of almost one year between the last treating note on June 26, 2015 and Dr. Guy's Physical Assessment, which was prepared on June 15, 2016, and submitted to the SSA after plaintiff's hearing. (R. 620-21.) That document does not contain any diagnosis, any narrative, or any discussion of the underlying conditions or symptoms (current or otherwise) that caused Dr. Guy to opine that plaintiff could not walk more than two blocks without rest or significant pain; could not sit or stand more than 2-3 hours, could not lift more than 10 pounds, would need to take "frequent" unscheduled breaks during the work day, and would be absent from work more than four days per month. (*Id*.)

Dr. Guy's opinion is also inconsistent with the earlier findings of consultative examiner Dr. Joshi, who personally examined the plaintiff on June 17, 2014 and found that she had a full range of motion and manifested no objective signs or symptoms that would correlate with the degree of impairment plaintiff alleged. (R. 388-91.) Thus, Dr. Joshi opined that plaintiff's only physical work-related limitations were "moderate limitations with squatting" and non-exertional limitations related to her history of seizures: "she should avoid working from heights, operating heavy machinery, or driving a motor vehicle." (R. 391.)

---

[13] Dr. Guy administered another injection on June 3, 2015, which he confusingly described as a "first injection . . . being done for diagnostic purposes. If it works good, two more will follow." (R. 521.) It is not clear from the record whether the June 3 injection was helpful, or whether plaintiff received any additional injections.

Since Dr. Guy's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and since it was inconsistent with "other substantial evidence" in the record, the ALJ did not err in determining not to give it controlling weight. 20 C.F.R. § 416.927(c)(2) *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (affirming rejection of treating physician opinion where it was "inconsistent with other substantial evidence.")

The Court is somewhat troubled by the short shrift that the ALJ gave to the remaining factors that he was required to consider in determining how much weight to give to Dr. Guy's opinion. Rather than address each of the regulatory factors "explicitly," in accordance with *Selian*, 708 F.3d at 418, ALJ Armstrong simply asserted, in conclusory fashion, that he had "considered" all of them. (R. 28.) Thus, for example, the ALJ never expressly discussed the "length of the treatment relationship and the frequency of examination" by Dr. Guy. *See* 20 C.F.R. § 416.927(c)(2)(i); *Selian*, 708 F.3d at 418. It is clear from the record, however, that the ALJ reviewed the (relatively few) treating notes from Dr. Guy (R. 26, 28), and thus was aware of the limited nature of his physician-patient relationship with plaintiff, the fact that a different doctor in his practice performed most of the physical exams, and the long gap between the last treating note and Dr. Guy's post-hearing Physical Assessment. These facts further support the ALJ's decision to accord Dr. Guy's opinion "little" weight. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (ALJ did not err in giving opinion evidence from two treating physicians "minimal" weight where "one of the physicians, Dr. Suresh Patil, only examined [plaintiff] once, while the other, Dr. Vilas Patil, had only four treatment notes bearing his signature, two of which were just co-signatures on reports by other providers," and "completed his medical opinion over a year after he had last personally seen [plaintiff]").

Moreover, "where 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie*, 412 F. App'x at 407 (quoting *Mongeur*, 722 F.2d at 1040, and concluding that it was "clear from the record as a whole" that the ALJ had properly considered that Drs. Patil were specialists, even though he failed to "expressly discuss the fact"). *See also Halloran,* 362 F.3d at 32-33 (declining to remand where the ALJ "applied the substance of the treating physician rule," even though he failed to expressly discuss the regulatory factors); *Atwater v. Astrue,* 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); *Gabrielsen v. Colvin,* 2015 WL 4597548, at *8 (S.D.N.Y. July 30, 2015) ("the ALJ need not explicitly consider each factor of the treating physician rule, but rather must only follow its mandate more generally").

In this case, the Court has no difficulty "glean[ing] the rationale" for the ALJ's decision to discount the opinion of Dr. Guy. The Court therefore concludes that the ALJ provided "good reasons," and an adequate (if underwhelming) roadmap, for his decision to assign little weight to the opinion of Dr. Guy.

### 2. Dr. Gonzales

Dr. Gonzales opined that plaintiff had "marked" limitations in every single area he evaluated. This alone raises concerns.[14] Moreover, his presumed status as a treating physician did

---

[14] Some of the questions on the form were clearly designed to assess a claimant's ability to handle progressively challenging job responsibilities. For example, question 2 asked about plaintiff's ability to understand and remember "very short and simple instructions," while question 3 asked about her ability to understand and remember "detailed instructions." (R. 612.) Common sense suggests that a claimant who has difficulty in this area is likely to be *more* limited as the

not insulate his opinion from the ALJ's well-founded critique that it was not "supported by the mental status examinations of record." (R. 28.) Insofar as it can be determined from the administrative record, Dr. Gonzales himself did not perform any mental status examinations of plaintiff Almodovar.[15] However, as noted above, consulting psychologist Dr. Damari performed a detailed mental status examination on June 17, 2014, with normal results except that plaintiff's attention, concentration, and memory skills were "impaired possibly due to emotional distress," and her cognitive functioning was "below average." (R. 383-85.) It was on this basis that Dr. Damari opined that plaintiff could follow and understand simple directions and perform simple tasks, and was only "mildly impaired in the ability to maintain attention and concentration." (R. 385.) Dr. Damari found plaintiff to be "significantly impaired" in only two areas – the ability to "perform complex tasks" and the ability to "deal appropriately with stress." (*Id*.)

Plaintiff's treating sources also reported normal or near-normal mental status exam results. On August 6 and September 3, 2015, Dr. Lopez-Leon observed that she was "well related, pleasant, open, and cooperative," with intact cognition. (R. 551.)[16] Social worker Angie Dang, who provided

---

instructions get more complex. Dr. Gonzales, however, checked the "marked" box" in response to each question. (*Id*.)

[15] Plaintiff listed Dr. Gonzales as a treating physician (R. 242), and Dr. Gonzales stated on his February 5, 2015 Mental Capacity Assessment that he had been treating Almadovar since "2014." (R. 615.) However, there are no treating notes from Dr. Gonzales in the record, nor any other documentation of treatment actually provided by him. It is thus not clear whether Dr. Gonzales's Mental Capacity Assessment was entitled to any presumption of controlling weight. *See*, *e.g*., *Mongeur*, 722 F.2d at 1039 n.2 (opinion of physician "who only examined [plaintiff] once or twice" was "not entitled to the extra weight of that of a 'treating physician'"). *Accord Petrie*, 412 F. App'x at 405.

[16] Plaintiff had a "full and bright affect" on August 6, but presented with a "restricted/low intensity affect" on September 3, 2015. (R. 551, 557.) On both occasions, Dr. Lopez-Leon noted that plaintiff was "well-groomed" (R. 551, 557), echoing Dr. Damari's observation that her "mode of dress was appropriate and neat." (R. 383.) These findings are inconsistent with Dr. Gonzales's

regular counseling to plaintiff through the Jewish Board, noted on June 22, 2015 that she was "euthymic, cooperative, and engaged" during an intake session (R. 539.) Psychiatrist Francis Hayden, M.D. (also at the Jewish Board), observed on March 21, 2016, that plaintiff was "cooperative," "engaged," and oriented x4, with normal speech, an anxious mood, and an appropriate affect. She reported auditory hallucinations, but no delusions or obsessions, and demonstrated an adequate memory, awareness of current events, intact judgment, and good insight and impulse control. (R. 590-91.) Dr. Hayden stated that plaintiff's symptoms were "improving" and her depression was "in partial remission." (R. 591-92.)

These conflicts, "between [Gonzales's] opinion and the treatment notes of the other mental health specialists with regard to the severity of Plaintiff's condition, were sufficient to undermine the presumption of the treating physician rule." *Rodriguez v. Colvin*, 2014 WL 5038410, at *5 (S.D.N.Y. Sept. 29, 2014). "Indeed, the Court finds that [Gonzales's] answers to the RFC questionnaire 'paint[ ] a bleak picture of [Plaintiff's] mental health that is quite at odds with the treatment notes.'" *Id.* (quoting *Rojas v. Astrue,* 2010 WL 1047626, at *7 (S.D.N.Y. Mar. 22, 2010)). ALJ Armstrong therefore did not err in concluding that Dr. Gonzales's opinion was not entitled to controlling weight because it was not "well-supported by medically acceptable clinical . . . diagnostic techniques and [was] inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).

Once again, the Court notes that the ALJ did not address every factor listed in § 416.927(c). As discussed above, however, a detailed discussion of each factor is not required if the ALJ

---

opinion that plaintiff was "markedly" limited in her ability to "adhere to basic standards of neatness and cleanliness." (R. 613)

provides "'good reasons' for the weight [he] gives to the treating source's opinion," which he did in this instance. *Halloran,* 362 F.3d at 32-33 (citing *Schaal,* 134 F.3d at 505).

### 3. Dr. Lopez-Leon

Remand is required, however, for the ALJ to properly weigh the remaining medical opinion evidence concerning plaintiff's mental impairments, including February 26, 2016 functional assessment by treating physician Dr. Lopez-Leon (R. 600), which ALJ Armstrong never mentioned. While an ALJ need not explicitly discuss every item of evidence in the record, the "failure to refer to the opinion of one of [plaintiff's] treating physicians is itself grounds for remand." *Smith v. Astrue*, 2013 WL 1681146, at *6 (E.D.N.Y. April 17, 2013) (collecting cases); *see also Colon v. Astrue*, 2011 WL 3511060, at *11 (E.D.N.Y. Aug. 10, 2011) ("[T]he ALJ committed legal error in not only failing to give good reasons for not assigning controlling weight to Dr. Bryk's opinion, but also for failing to mention Dr. Bryk at all, indicating that his opinions and ongoing treatment history with plaintiff were not considered."); *Castillo v. Colvin*, 2015 WL 153412, at *21 (S.D.N.Y. Jan. 12, 2015) (remanding where "[n]o mention was made of Dr. Rosario or the psychotherapists who treated plaintiff; implying that no weight was given to that evidence, and without good reason"). Thus, while an ALJ is free to discount a treating psychiatrist's views – after giving "good reasons," *Greek v. Colvin*, 802 F.3d at 375, in accordance with 20 C.F.R. § 416. 927(c) (2012) – he is not free to ignore those views altogether.

### 4. Dr. Damari and Dr. Kamin

The ALJ further erred in giving more weight to Dr. Kamin's opinion than to Dr. Damari's. 20 C.F.R. § 416.927(c)(1) (2012) provides that more weight is "[g]enerally" due to "the opinion of a source who has examined you than to the opinion of a source who has not examined you." *See also Ridge v. Berryhill*, 294 F. Supp. 3d 33, 61 (E.D.N.Y. 2018) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990)) ("The general rule is that the written reports of medical advisors

who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.") (internal quotation marks omitted); *Maldonado v. Comm'r of Soc. Sec.*, 2014 WL 537564, at *16 (E.D.N.Y. Feb. 10, 2014) (quoting *Fofana v. Astrue*, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011)) (in the absence of an opinion from a treating mental health physician, the ALJ should have given greater weight to the opinion of the consulting examiner than to the opinion of the non-examining review psychologist who "relied solely on the medical records in the administrative record to form her opinion"); *Fofana*, 2011 WL 4987649, at *20 (quoting *Hernandez v. Astrue,* 2011 WL 1630847, at *10 (E.D.N.Y. Apr. 29, 2011)) ("While it is true that the opinion of a consultative physician 'should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist,' it should certainly be given more weight than that of a non-examining, non-treating source who merely conducts a paper review.") (internal citation omitted), *report and recommendation adopted,* 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011).

This rule is particularly important in the mental health context, "because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Fofana,* 2011 WL 4987649, at *20 (quoting *Velazquez v. Barnhart,* 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007)); *accord Maldonado*, 2014 WL 537564, at *15.

In this case, Dr. Damari – a specialist – personally examined the plaintiff, at the request of the agency, on June 17, 2014. The ALJ gave her report "some weight." He accepted Dr. Damari's opinion in the areas where she found that plaintiff had no limitations or was only "mildly impaired," but rejected the portions of her opinion concluding that plaintiff was "significantly" impaired in the ability to perform "complex" tasks independently and "appropriately deal with

stress." (R. 27.) The ALJ explained that these conclusions were not "supported in the record" and were "largely speculative given the nature of [her] one-time observations of the claimant." (*Id.*) Instead, the ALJ gave "significant" weight to the June 25, 2014 opinion of non-examining state agency psychologist Dr. Kamin. (R. 28.)

Dr. Kamin largely agreed with Dr. Damari's conclusions, finding that plaintiff was "capable of performing simple work on a sustained basis, but "moderately" limited in her ability to "understand and remember detailed instructions" and "carry out detailed instructions." (R. 103-04.) In the area of "adaptation," Dr. Kamin also found that plaintiff was "moderately" limited in her ability to "respond appropriately to changes in the work setting." (*Id.*) The ALJ gave "significant" weight to Dr. Kamin's opinion, without any reservations or exceptions. (R. 28.)

Any difference between Dr. Kamin and Dr. Damari regarding the precise degree of plaintiff's limitation in understanding and carrying out detailed or complex instructions or tasks is immaterial, because the plaintiff's RFC, as formulated by ALJ Armstrong, limits her to "simple, unskilled" work. (R. 24.) However, Dr. Kamin did not identify any limitations on plaintiff's ability to deal with stress other than "changes in the workplace setting." (R. 103-06.) Nor, apparently, did he notice Dr. Damari's broader (and therefore more limiting) opinion that plaintiff was "significantly impaired in the ability to appropriately deal with stress." (R. 385.) Thus, Dr. Kamin mistakenly answered "no" to the question, "Are there any medical source . . . opinions about the individual's limitations or restrictions which are more restrictive than your findings?" (R. 105.)

In this instance, the difference between the two psychologists' opinions matters. While the ALJ limited plaintiff to "simple, unskilled" work at SVP 1 or 2, he made no provision at all for any stress-related limitations in his RFC formulation. In SSR 85-15, 1985 WL 56857 (Jan. 1, 1985), the Commissioner made it clear that where mental illness is at issue, "the skill level of a

position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." 1985 WL 56857, at *6. The "basic mental demands" of unskilled work go beyond the ability to understand, remember, and carry out, simple instructions; the employee must also "respond appropriately to supervision, coworkers, and usual work situations" and "deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id*. at *4.[18]

Determining whether individuals with mental impairments will be able to adapt to the "'stress' of the workplace" is difficult, requiring "thoroughness in evaluation" on an "individualized basis" by the ALJ. SSR 85-15, 1985 WL 56857 at *5; *see also Valentin v. Berryhill*, 2017 WL 3917004, at *17 (S.D.N.Y. Sept. 6, 2017) (ALJ must consider "what is the appropriate finding as to the claimant's ability to tolerate stress, how that finding impacts her RFC, and what jobs would be available based on that RFC"); *Fontanez*, 2017 WL 4334127, at *22 (quoting *Marthens v. Colvin*, 2016 WL 5369478, at *12 (N.D.N.Y. Sept. 22, 2016)) (where stress is an issue, the Commissioner must "make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect [her] ability to work"). This obligation cannot be satisfied by "merely indicating that the claimant can perform simple, unskilled work." *Hendrickson v. Astrue*, 2012 WL 7784156, at *8-9 (N.D.N.Y. Dec. 11, 2012) (collecting cases), *report and recommendation adopted,* 2013 WL 1180864 (N.D.N.Y. Mar. 20, 2013); *accord Bryant v. Berryhill*, 2017 WL 6523294, at *4 (W.D.N.Y. Dec. 21, 2017) ("limiting

---

[18] *See also* SSR 96-8P, 1996 WL 374184, at *6 (July 2, 1996) ("Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.").

[plaintiff] to unskilled work did not satisfy the ALJ's obligation to specifically analyze her ability to deal with stress"); *Collins v. Colvin*, 2016 WL 5529424, at *3 (W.D.N.Y. Sept. 30, 2016) (same).

When an ALJ "uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy." *Annabi v. Berryhill*, 2018 WL 1609271, at *16 (S.D.N.Y. Mar. 30, 2018). Here, the ALJ did not point to any specific evidence in the record – or even any category of evidence – that is inconsistent with Dr. Damari's conclusion regarding stress.[19] Moreover, while it is true that Dr. Damari only observed plaintiff once, this cannot be a basis for rejecting some but not all of her conclusions, since all of them were based on the same one-time examination. *See Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 200 (2d Cir. 2010) ("while contradictions in the medical record are for the ALJ to resolve . . . they cannot be resolved arbitrarily") (citations omitted). The ALJ therefore failed to articulate a "sound reason" for the weight he gave to different portions of Dr. Damari's opinion.

Nor does Dr. Kamin's opinion provide any counterweight to the aspects of Dr. Damari's opinion that the ALJ rejected. Dr. Kamin possessed no greater expertise than Dr. Damari (both had doctoral degrees in psychology), never saw the plaintiff at all, and had no opportunity to review plaintiff's complete treatment records. In fact, the *only* medical evidence that Dr. Kamin had before him when he rendered his opinion on June 25, 2014, was Dr. Damari's report, rendered one week earlier. (R. 97, 104.) Dr. Kamin's analysis, therefore, consisted of reading Dr. Damari's report and drawing his own conclusions from the information reported therein. (R 104.)

---

[19] Treatment notes from the doctors and nurses at the Jewish Board frequently reference plaintiff's symptoms of "anxiety" and "panic attacks" (*see, e.g.*, R. 542, 551, 557, 561, 563, 568, 590, 598-99 ). Nothing in these notes, therefore, is inconsistent with Dr. Damari's opinion that dealing with stress is particularly challenging for plaintiff.

On these facts, it was error for the ALJ to give more weight to Dr. Kamin's conclusions than to those of the examining psychologist on whose report he relied. *See Murphy v. Berryhill*, 2019 WL 1075605, at *7 (E.D.N.Y. Mar. 7, 2019) ("The ALJ erred in assigning great weight to a non-examining medical expert's opinion who did not review a large portion of Plaintiff's medical records."); *Fontanez v. Colvin*, 2017 WL 4334127, at *21-22 (E.D.N.Y. Sept. 28, 2017) (collecting cases and remanding where ALJ improperly relied on opinion of non-treating, non-examining expert, "based on an admittedly incomplete record," to determine plaintiff's mental RFC). *See also Gunter*, 361 F. App'x at 200 (reversing district court and remanding to SSA where "Dr. Wells, a non-examining physician, made his assessment without reviewing the complete record of Gunter's medical history").

### D.     On Remand

Because remand is required for the ALJ to reassess the psychological opinion evidence and reevaluate plaintiff's RFC based on a proper evaluation of that evidence, the Court need not reach plaintiff's remaining arguments. On remand, the ALJ must expressly consider Dr. Lopez- Leon's opinion, reweigh the remaining opinion evidence as to plaintiff's mental impairments in accordance with 20 C.F.R. § 416.927(c) (2012), and specifically consider "what is the appropriate finding as to the claimant's ability to tolerate stress, how that finding impacts her RFC, and what jobs would be available based on that RFC." *Valentin*, 2017 WL 3917004, at *17. The ALJ may, of course, "recontact medical sources to request clarification or additional information regarding their opinions," *id.*, and may also arrange for additional consultative examinations as necessary to update the record and ensure an adequate basis for a disability determination.

## VI.    CONCLUSION

For the reasons set forth above it is hereby ORDERED that plaintiff's motion be GRANTED, that the Commissioner's motion be DENIED, and that this action be REMANDED, pursuant to 42. U.S.C. § 405(g), for further proceedings consistent with this Opinion and Order.

The Clerk of Court is respectfully directed to close the case.

Dated:  New York, New York
        March 22, 2019

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**